309-1048, the people of the state of Illinois, and I believe by the words of Michael v. Michael Berry, appellant by Daryl Oman. Mr. Oman? Good afternoon, Your Honors. May it please the Court, I'm Daryl Oman, and I represent Michael Berry, who is the defendant appellee in this case. I raised three issues in my brief, but I intend to focus today on the first issue, which I believe is relatively more nuanced. The second and third issues are relatively straightforward. Two particularly nuances of the first issue, which is a single eyewitness identification based on a less than two-second glimpse was insufficient to prove beyond a reasonable doubt that Michael Berry personally discharged a firearm. So, one of the two major nuances is that the state decided in a jury trial in this case to charge and instruct the jury with personal discharge. And under the add-on statute that a finding that Berry personally discharged the firearm in his attempted murder case directly resulted in a 25-year add-on to his sentence. It could have charged him, alternatively, it could have charged him with something less, but decided to go for the 25-year add-on. Therefore, as a result of that, it was required to prove beyond a reasonable doubt that element that Berry is the person who personally discharged. And as we'll discuss, there's quite a bit of doubt regarding that fact. The second distinction is this is not a standard run-of-the-mill reasonable doubt case, which, as this Court well knows, is definitely an uphill battle for a criminal defendant in light of the standard of review. This is a case where it's based entirely, this fact that he personally discharged is based entirely on a single eyewitness identification. And a specialized area of law applies to reasonable doubt arguments regarding eyewitness identification testimony. And that relates back... Let's just test that a little bit, that there was just, that was the only evidence to support this. How many people were, was there testimony on how many fellows were up there in the hall where the shooter was? Well, there's testimony concerning various places inside and outside the building, but by and large, there were three people. There was Michael Berry, his co-defendant, who was referred to as Nitty throughout the record, and there's a gentleman named Jamar Jr. The, and, but the argument seems to be that Nitty was the shooter, right? Well, there's at least a reasonable doubt that Nitty was the shooter and not Michael Berry. Well, if Nitty was the shooter, why would Nitty yell, shoot that guy? Well, there's a great deal of variability in the testimony you're referring to is the victim's testimony that he heard Nitty say, paraphrasing, shoot that guy. But even the State recognized the variability in his testimony and argued during the closing argument that perhaps it wasn't Nitty who said that, perhaps it was Jamar Jr. who said that, which leaves open possibility that the shooter was either Nitty or Michael Berry. Again, there's three people. Well, but the victim had just been outside and had heard Nitty's voice shortly before this, right? Yes. So, anyway, some evidence, right? It can be, so, I mean, that's some evidence that it certainly wasn't Nitty anyway. Well, that's true, but it's not the defendant's burden to prove who the actual shooter was. I get that, but it's a question of whether there's some evidence other than just the identification. There is. What about the fact that your client goes in and puts down a revolver and had evidence that he was involved in the shooting? Well, again, that's the important distinction. Yes, there is lots of circumstantial evidence that he was involved in the shooting, but hearkening back to my first point of emphasis, the State had the burden of proving that he was the shooter, that he personally discharged the firearm. It's not enough for them. They made a strategic choice. They could have charged him under an accountability theory or just honestly charged him for attempt murder without the add-on, and it would have been enough for them to prove that he did some affirmative act, that he was somehow involved in the shooting to sustain his attempt murder conviction. They decided not to do that. They decided to go all or nothing with a jury instruction on personal discharge, and they won. They got the additional 25 years. Did he, was there evidence that he went in and washed up and changed clothes when the police got there? There is, and there's also evidence that he and the same apartment went in the bathroom and he washed up. So, again, this is all circumstantial evidence that he was among this group of people who potentially were involved in the shooting. But, again, under the specific facts of this case, the allegations, the jury instructions propounded by the State, that's not enough. They have to prove specifically that he was the shooter, and that's what I mean when I refer to the only evidence indicating that he was the shooter. There's no ballistics evidence here. They didn't even find the gun. The evidence your Honor referred to about that he placed the gun on the table, there was other conflicting evidence that the gun was placed in a completely different apartment. Now, the officers arrived on the scene immediately, searched both apartments, didn't find the gun in either apartment. Significantly, there's also evidence that a witness saw Nitti with the gun fleeing the scene of the shooting. So now we have three different stories about what happened to the shooter. The only one that's potentially consistent with the physical evidence is that Nitti removed the gun from the scene, because the other two stories put it either in the third-floor apartment, which was searched, didn't contain a gun, or the second-floor apartment, which was searched and, again, didn't contain a gun. So the most likely inference based on that is that Nitti had the gun and he left, or we don't know what happened to the gun. It's not in evidence. Certainly there's no fingerprints on a gun, ballistics evidence, GSR evidence, anything that would tie my claim to personal discharge in the shooting. It's entirely based on this. And, again, the victim was very, very frank and honest in his assessment. We're not claiming that he's lying here. It's just simply a misidentification. He claimed that he saw the shooter for less than two seconds, only a very brief glimpse. He also testified that he was partially behind a door. And this is significant that it's a mistaken identification in this case, as opposed to just some general category of reasonable doubt, because mistaken eyewitness identifications have been recognized as the leading cause of wrongful convictions in this country. And, again, speculation, excuse me, skepticism of identification evidence dates back to at least 1967, where the United States Supreme Court in United States v. Wade said, quote, The vagaries of eyewitness identification are well known. The annals of criminal law are rife with instances of mistaken identification. And I submit that the decades since then, particularly in Illinois, have only underscored the fact that innocent people can be convicted based on mistaken identification. Now, the Illinois Supreme Court and the U.S. Supreme Court have applied what we refer to as the Biggers test, which is a five-part test. And it's been applied by the Illinois Supreme Court in people v. Slim and subsequent cases, instructing appellate courts to look at findings, by a trier fact, and evaluate. If it hinges on eyewitness identification testimony, you need to look. It's uncorroborated, like it is in this case, with respect to the specific element. You need to look at the five Biggers factors, which are the witness's opportunity to view the offender, the witness's degree of attention, the accuracy of prior descriptions, level of certainty, and the length of time between the incident and the identification. Turning to the first factor, this Court has recognized that that's the most important factor because, of course, a witness cannot be expected to reliably identify somebody who they didn't get a good opportunity to see for a variety of reasons. Now, the facts in the record relating to this first element are, again, Lewis testified he only had a, quote, quick glance, and, again, he estimated that it was less than two seconds before he turned and ran away. He was not looking in the direction of the shooter before the shooting occurred. He was not looking afterwards. He was running for his life. Less than two seconds is the amount of time that he was looking. He also testified that the shooter was behind a door, at least slightly behind the door. It's not really clear how much, but it's at least partially obscured. The evidence in the record concerning the lighting conditions or the distance is a picture of the camera, which an evidence technician came out to the scene and took with a flash camera, and he did it only after propping open the door to the stairwell to take the picture. That's what's in the record. Didn't they also say some of the light in the thing was actually, there was almost too much light that was interfering with the photograph? I'm not, I don't recall what Your Honor is referring to, but certainly if the technician determined there was too much light, he wouldn't use the flash camera. He would have turned the flash off. Well, actually, he might because it shatters and stuff, but it wasn't his testimony that there was at some points there was so much light that it interfered with the ability to get the photograph. I'm sorry, I don't recall what testimony Your Honor is referring to. Turning to the second biggest factor is the witness's degree of attention, and as I just noted, he wasn't focused on the shooter. He was not looking in that direction. He was walking out a door headed out of the building, and the shooter was not in the direction that he was headed. Again, he only looked in the direction of the shooter for less than two seconds. After the shooting, he was facing in a different direction and fleeing the shooter. There's also an issue concerning weapon focus, which we went back and forth in our briefs. The state has argued, as it often does in jury trials, that when someone's pointing a gun at you, you remember the face of the person pointing the gun at you. Now, the state cites nothing in terms of authority for that proposition, and I came back in my reply brief with at least two citations to cases where that's the opposite of the truth, that if you're focused on a gun, you're not focused on the face of the person. This is particularly true when we're talking about a period of time of less than two seconds. That doesn't allow the witness to look at the gun and look at the face of the person holding the gun. It's also backed by social science research, which I refer to, I believe, in my reply brief. I talk about the New Jersey Supreme Court Special Master Report and eyewitness identification testimony. Since I filed that brief, the New Jersey Supreme Court has acted on that and issued an opinion recognizing that weapons focus is a degree that detracts from an identification, that the degree of attention is on the weapon and not on the face and the identity of the person shooting. The third biggest factor is the accuracy of the witness's prior descriptions, and this is a particularly bad fact for the prosecution here because it's undisputed in the record that the witness's initial description said that After he fled the scene, he met with his friends at AutoZone waiting for an ambulance, and they both asked him who the shooter was, and he identified Nitti to both of them. And again, the victim is very candid in his testimony. He admitted when he was asked, Who did you identify? Who did you say was the shooter? He said, Nitti. I identified Nitti as the shooter. Only later, after many hours, it's not clear exactly how many, he was taken to the hospital. An officer interviewed him there. He still didn't identify Barry as the shooter. Went back to the police department. At this point, all three of these gentlemen were in custody. He compiled a photo array, and then eventually he pointed out, My client is the shooter, and Nitti, as Your Honor says, the person who instructed him to shoot him. So again, there's a temporal gap here. This isn't his story, and he stuck to it. If we were looking at a case here where all we have is an identification, but he had a great opportunity to view him. There was a great degree of attention. He immediately identified Barry as the shooter. Didn't identify somebody else or did it in a short period of time. There wasn't a weapons focus issue. That would be a better case, and maybe that would be enough to sustain the conviction for personal discharge in the firearm. But we don't have that in this case. There's two other bigger factors, which I submit are less important than the ones we already discussed. Number four is the level of certainty, and I go at great length in my initial brief to point out that this factor was created back in the 1960s. Social science research since then has indicated there's not really a correlation between the certainty of a witness's identification and the accuracy of the identification. Some studies have shown there's an inverse correlation, and these studies have been referred to by other Illinois courts. It's not been seriously disputed. The state does not dispute social science research in its brief. And again, the New Jersey Supreme Court has recently issued an opinion based on the Specialist Master's report I cite, which shows that level of certainty is not really a legitimate factor here. Other states have completely abolished it, including New Jersey, Kansas, and Utah. It's still part of the Biggers test in Illinois, but I submit that it's the weakest factor by far and should get very little weight. The fifth factor is the length of time between the offense and the identification, and we've already kind of gone into that about how it was not immediate identification of Barry as the shooter. In fact, he initially identified somebody else as the shooter and that there were intervening hours before the first time Barry was identified as the shooter. Now, in light of the way that this case was pled, the way that the jury was charged to say a strategic decision to go all or nothing on personal discharge, the appropriate remedy here is an outright reversal. And some... Thank you. Some authority for that is, I cite in my brief, the United States Supreme Court decision... excuse me, the Illinois Supreme Court decision in People v. Smith where the court held that, quote, the weakness of the state's chief witness, which in this case would be the victim, along with the lack of other direct evidence linking the defendants to the crime required a not-guilty verdict as a matter of law. And the facts of that case are actually similar to this. The court goes on to say, quote, the circumstantial evidence, which Your Honor referred to, linking the defendant to the murder, that was a murder instead of an attempt murder, merely narrowed the class of individuals who may have killed the victim in this case. In this case, potentially it narrows it to these three individuals. Without pointing specifically to the defendant, two other men were with the defendant the night of the shooting. Again, I'm still quoting Smith here. Again, two other men were with Mike Klein on the night of the shooting. They, like the defendant, were also wearing dark clothing. Again, remarkably, the record shows here, Michael Berry and Nitti were both wearing the exact same clothes, a black shirt, black shoes, and jeans, as indicated in the reported proceedings at page 530. Also, this court in Pupil v. Taylor reversed an involuntary manslaughter conviction outright, the relief we seek in this case, despite ample evidence that the defendant was, quote, present at the scene and that he associated with the perpetrators. Again, this is the circumstantial evidence we're referring to here. There is, I admit, candidly, there's evidence that he associated with these two other individuals. Significantly, though, in this case, the record's clear that he actually came downstairs to break up a fight between Nitti, the co-defendant, the victim, and another man. Nitti had been downstairs, and he was beating a man named Travell Shorts with a chain when Berry came down, again, the record's undisputed, and broke up the fight. At that point, Nitti was enraged and said, give me a gun so I can shoot them, and Berry refused. He said, no, you can't have the gun. So at this point, Nitti obviously has a motive. There's evidence in the record that he has a preexisting dispute with these two men, which is why they were fighting in the first place. Thank you. Berry's not even from there. So for all of these reasons, this court should reverse. Thank you. Any questions? Ms. DeMichael. May it please the Court, Mr. Counsel, Laura DeMichael on behalf of the people. As defendant has focused only on the first issue, the people will focus on that issue as well and rest on the arguments made in their brief for the other issues. Defendant was proven guilty beyond a reasonable doubt of attempt first-degree murder with a firearm add-on. The people agree that they had to prove beyond a reasonable doubt that the defendant was the shooter, and the people did prove beyond a reasonable doubt that the defendant was the shooter. Defendant's reasonable doubt argument largely disregards the standard of review, which is viewing evidence in the light most favorable to the people, whether any rational trait or fact could have found the essential elements of the crime proven beyond a reasonable doubt. The jury's verdict was supported by the evidence and should be affirmed. Highlighting some of the evidence of guilt in this case, the victim's friend got into an altercation with defendant's friend, Nitty. Defendant then came outside not to break up a fight. Defendant comes outside with a gun and tells Nitty they need someone their own age to shoot, and he's referring to the victim at that time, who's closer to their own age. He doesn't want to shoot the other guy because he's younger and also he knows their family. The victim then went into the basement of the nearby apartment building, and when he's coming back out, he hears Nitty tell defendant to shoot him. He turns and sees defendant. Defendant then shoots him. The victim and defendant were alone in the stairwell at that time, and the victim was certain that the defendant was the man that shot him. At the hospital, just hours after the shooting, the victim spoke with police, identified defendant as the shooter, and picked defendant out of a photo lineup as the shooter at that time. By witnesses other than the victim, the defendant was seen with a gun before and after the shooting. The defendant was identified as having been at the scene of the shooting at the time of the shooting. This is perhaps the most important piece of corroborating evidence. A video interview of Julian was substantively admitted, and in that video, which the people could tell that happened from the video based on the statements in the trial record as the video wouldn't play on counsel's laptop, but Julian testifies that defendant is entering the stairwell on the second floor as the shots are fired, and Julian's just down the hall going into his apartment. So there's testimony that there's one person in that stairwell, and with the Julian testimony, we know that that one person is the defendant. Defendant was also seen washing his hands, changing his clothes, and when police arrived at the apartment he was in, he told people, don't talk to the police. He said, you guys know nothing. Turning to the victim's identification of the shooter, the identification of the shooter was reliable, and there was certainly much evidence for the jury to find that it was reliable. The jury was instructed on the biggers and factors, and it was the job of the jury to apply them. Factor one, opportunity to view the offender. The important point here is that that stairwell is not the first time that the victim ever saw the defendant. The victim had first observed both defendant and Middy outside minutes earlier for a longer period of time than two seconds when he was then facing the shooter minutes later. He would be able to tell in one glance which guy it was, and under Cruz, a short glance is sufficient to support a conviction and an identification. The victim testified that he was standing close to defendant, and pictures of the stairwell show that that would be true. The victim said that nothing was covering defendant's face. Defendant may have been slightly behind an open door, but his face certainly wasn't. Regarding the lighting in the stairwell, there was testimony as to the existence of overhead lights, and the officer testified that the overhead lights were strong enough to interfere with a photo, and that's page 475 of the record. There was no testimony that the reason the door was held open or that the reason a flash camera was used was because the stairwell was so dark. Without it, in fact, if you think about taking pictures indoors, they always look darker than the actual conditions, and that's why you usually need flash indoors. Factor two, the degree of attention. A jury could find that a victim would be paying a high degree of attention to someone shooting at him. A victim can be nervous and still be paying attention and still be able to identify who it was that was shooting at him. Contrary to statements made by defendant in his reply brief and here today, there is no authority for the proposition that a witness with a gun pointed at him would have a low degree of attention. To support that statement, defendant cites two non-presidential out-of-state cases, and those cases actually do not even support his statement. The Swopes case, the court stated, quote, the witness's degree of attention would have been high while being robbed. Similarly here, the degree of attention would be high while being shot at. The Clements case, the court found that a nervous witness's degree of attention supported the reliability of an identification. Factor three, accuracy of prior descriptions. Here the victim gave an accurate prior description. Only three to four hours after the shooting, the victim is speaking with police, and I believe this was at the hospital, not at the police station, and at that point he identified defendant as the shooter and picked his photo out of a line-up saying that he was the shooter. It is true that while minutes after the shooting, lying on the autosome floor with blood oozing out of his face when he can't even open his jaw, his friend Bianca Ellis asked him, did Nitti do it, and he nods yes. But at trial, the victim explained why he nodded yes in that situation, and that was because Nitti was involved in the shooting. Nitti ordered the shot. Nitti said, shoot him, to defendant, and the victim did not know defendant's name at that time. Factor four, degree of certainty. This is a vigorous factor. Defendant agrees, vigorous applies, and the victim said he was certain that it was defendant that shot him. This is the law in Illinois. What others seem to do does not affect what the law in Illinois does. Factor five, the length of time between the crime and the confrontation. The victim identified defendant as the shooter and picked him out of the line of only three or four hours after the shooting. I believe the times are stated in the people's brief, but it was approximately three to four hours after the shooting. It was the job of the jury to determine the credibility of the witnesses, to weigh their testimony, resolve inconsistencies in the evidence, and draw reasonable inferences. And viewing the evidence in the light most favorable worlds of the people, it's clear that the jury's verdict was supported by the evidence. If there are no further questions. Thank you, Ms. Mike. Thank you, Your Honor. Mr. Allman, some rebuttal? May it please the court. Very briefly, Your Honor, I'd like to address a number of misstatements made by the state. Initially, the state kind of makes light of the social science research, which it really didn't comment on at all in its brief, regarding both the level of certainty as a factor and how it should be weighed by this court, and also weapons focus. I previously, in my initial presentation, referred to State v. Henderson, which is the New Jersey Supreme Court case referring to the special master's report cited in my brief. If I could very briefly quote from that case, the court addressed weapon focus. Quote, when a visible weapon is used during a crime, it can distract a witness and draw his or her attention away from the culprit. Weapons focus can thus impair a witness's ability to make a reliable identification and describe what the culprit looks like if the crime is of a short duration. Was that argued to the jury in this case? The biggest factors were argued to the jury. There's an Illinois pattern jury instruction that goes into the five biggest factors. Okay, but I mean, in a public argument, did they make that argument to the jury? There was argument, I believe, about the impact of the weapon. I can't recall specifically in this case, but it is a standard argument that the State just made concerning someone's pointing a gun at you that draws attention to the person pointing the gun at you. That's wrong as a matter of fact. Scientific evidence is undisputed that that would be the same as saying the sun rises in the west and sets in the east. It's clear that that's not the case, that a weapon draws attention away from the face of the shooter. Is it relevant to this type of analysis that the victim had seen the defendant and nitty out in the courtyard moments earlier and had no longer time to see him to whether or not he was able to identify your client on a short glance? Is that relevant to the analysis? I mean, it's somewhat relevant. It's a sliding scale, obviously. Does the social science talk about that? Yes. And it's common sense that you're much more likely to accurately identify somebody who you know well. For example, in a domestic situation, a husband and a wife, we're not going to doubt that you accurately identified your spouse. On the other hand, if it's a total stranger, social science with respect to cross-racial identification, somebody you don't know of a different race, much lower level. This is somewhere in between. As counsel pointed out, he didn't even know Barry's name. He did see him in the courtyard before. He also saw nitty in the courtyard before. He knew nitty very well. They all lived together in the same complex. He testified that there was some kind of financial dispute between him and nitty and Trudell Shores, who was the gentleman who got beat with a chain by nitty before the shooting. And the person he first identified as the shooter was, quote, nitty, nitty, is what he told his friends. Did he say it was nitty? Was he speaking to these people when he first identified nitty? I can tell you exactly what he said. Pardon? I can tell you exactly what he said. Lewis's testimony was Bianca Ellis, a friend of his, went to AutoZone and asked him who did it, and he said, quote, nitty, nitty. That's on page 415 of the record. Bianca Ellis testified that she asked who did it, and he said it was the dude from upstairs, and she asked if he was referring to nitty, and he shook his head yes, he meant nitty. Trudell Shores, the gentleman who was beaten with a chain, followed him into AutoZone, asked him, quote, I was like, you are right, who shot you? He said nitty. That's page 318 of the record. Again, Lewis admits, candidly, that he initially identified nitty as being the person who shot him. Counsel also referred to Jamar Julians, the evidence concerning Jamar Julians, the third of the three gentlemen, in addition to Michael Berry and nitty, concerning, I believe she said that he entered the stairwell as shots were fired. That's not his testimony. That's not his statement. He testified that the three of them came into the building after this physical tussle and went upstairs. He testified that Berry did not stop on the second floor, but that he went up to the third floor. Now, the shooting occurred as Lewis was coming up from a garden apartment, so the shooter was down, shooting down towards a person coming up from a garden apartment. But Julians' testimony was that Berry was up on the third floor when the shooting occurred. Counsel, you have one minute. Thank you. He also testified that five minutes after the shooting, Berry came downstairs and knocked on the door. That's pages 601 and 636 of the record. That they both went up to the third floor and down to the second floor. So Julians was very clear in his testimony, and again, this aspect of his testimony is consistent with his prior statement, that they went up to two, they went up to three, two, three. The shooting occurred down. Now, what he didn't know was where nitty was this whole time. He assumed that nitty also went up to the third floor, but he never saw him until after they were all together in the apartment after the shooting. Significantly, Bianca Ellis told two different police officers that she saw nitty fleeing the scene with a gun. That's also in the record. And again, the other versions of events concerning where the gun supposedly ended up, the third floor apartment, the second floor apartment, are firmly disproven by the physical evidence in that the officers immediately responded to the scene, very clear from the record, searched both of those apartments, and didn't find the gun. What's unimpeached is Ellis' prior statement that she saw nitty running from the building with the gun. Counsel, your time is up. Thank you, Your Honor. Okay, thank you both for your arguments here this afternoon. The matter will be taken under advisement. A written disposition will be issued. And right now, the court will be in recess until 9 a.m. tomorrow.